State v. Corizon Health, Inc., No. S0784-11 Cnc (Teachout, J., Aug. 29, 2012)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

**SUPERIOR COURT**                                  **CIVIL DIVISION**
**Chittenden Unit**                                  **Docket No. 784-11Cnc**



**STATE OF VERMONT,**
       **Plaintiff**


       **v.**


**CORIZON HEALTH, INC., f/k/a**
**PRISON HEALTH SERVICES, INC.,**
       **Defendant**



### DECISION
### Motion for Judgment on the Pleadings, filed June 4, 2012 by Plaintiff

This is a declaratory judgment action in which the Plaintiff State seeks a declaration that Defendant Corizon Health, Inc. has an obligation to provide the State with a defense in the separate pending case of *James Gipe, Administrator of the Estate of Ashley Ellis vs. State of Vermont,* Docket No. 515-7-11 Rdcv.

The State filed a Motion for Judgment on the Pleadings on June 4, 2012, and an Opposition and Reply Memorandum were timely filed. Oral argument was heard on August 21, 2012, at the same time oral argument was heard on Corizon's Motion for Summary Judgment in the *Gipe v. State* case on essentially the same issue.

The State is represented by Assistant Attorneys General Mark J. Patane and Keith Aten. Corizon Health, Inc. is represented by Attorney Samuel Hoar, Jr. Administrator James Gipe, who has been granted Intervenor status in this case, is represented by Attorney Shannon A. Bertrand. All were present for oral argument on August 21, 2012.

*Gipe v. State* is a wrongful death action against the State of Vermont based on the death of Ashley Ellis who died when she was a prisoner in the custody of the State of Vermont Department of Corrections in August of 2009. At the time that Ms. Ellis was in prison, medical services at state prisons were provided by Prison Health Services, Inc. (hereinafter PHS), which is now known as Corizon Health, Inc. (hereinafter Corizon). There was a contract between the State and PHS specifying the terms and obligations for the provision of medical services by PHS. It also obligated PHS to provide a defense and indemnify the State with respect to claims made against the State arising out of acts of PHS.

Ms. Ellis had a condition called hypokalemia, which means that she had a very low potassium level. Potassium is necessary to sustain life. She required potassium medication, which she was taking when she entered prison. She did not receive potassium medication in prison, and as a result she died of hypokalemic induced cardiac arrhythmia.

Mr. Gipe, as Administrator of the Estate of Ashley Ellis, made claims against both Corizon, formerly PHS, and the State of Vermont. Corizon made a private settlement with the Administrator before any lawsuit was filed. Part of the terms included a Covenant Not to Sue, in which the Administrator agreed not to bring any claims against Corizon or the State, including any claims for which Corizon could owe a duty of defense or indemnification.

The Administrator then filed the case of *Gipe v. State* in the Rutland Unit of the Superior Court. Two days before *Gipe v. State* was filed, the State filed this declaratory action in the Chittenden Unit seeking a declaration that Corizon is obligated to provide a defense to the State in *Gipe v. State*. Both cases were specially assigned to the undersigned.

The State attached to its Complaint in this case a copy of the Contract between PHS and the State of Vermont Department of Corrections that was in effect at the time of the death of Ms. Ellis (Exhibit A), and a copy of the original Complaint in *Gipe v. State* (Exhibit B). The Complaint in *Gipe v. State* was subsequently amended, and a copy of the Amended Complaint is attached to the Motion for Judgment on the Pleadings as Exhibit C.

In its Motion for Judgment on the Pleadings, the State argues that under the terms of the Contract, Corizon is obligated to defend and indemnify the State and its employees against the claims asserted in the Amended Complaint. Corizon argues, as does the Intervenor Administrator, that the claims stated in the Amended Complaint do not implicate acts of PHS, but are based solely on acts of the State and its employees. Corizon argues alternatively that in the event the Court finds that there is a contractual duty to defend, the Covenant Not to Sue provides a complete defense to any such claims.

The State has the burden of showing that its contract with PHS requires PHS to provide a defense in the *Gipe v. State* case. The methodology is to compare the terms of the contract with the claims set forth in the Amended Complaint to determine whether or not the claims trigger the duty to defend. *Tateosian v. State,* 2007 Vt 136, ¶ 16.

The Contract provides in pertinent part as follows:

Attachment C, Page 52, ¶ 5: "The Contractor [PHS] shall indemnify, defend and hold harmless the State and its officers and employees from liability and any claims, suits, judgments, and damages arising as a result of the Contractor's acts and/or omissions in the performance of this contract."

2

Attachment I, page 77:

> Attachment C, Paragraph 5 of this contract pertaining to defense and indemnification is intended by the parties to include (i) defense of all claims, and/or lawsuits, including but not limited to actions for damages and/or for declaratory or injunctive relief, to the extent that they contain allegations that arise as a result of the Contractor's negligence in the performance of services under this contract and/or intentional misconduct in the performance of services under this contract (intentional misconduct to include. . .)whether or not the Contractor, an employee of the Congractor, or a subcontractor of the Contractor is a named party to the action and (ii) indemnification to the extent that any such claim or lawsuit results in a final determination. . . . The parties do not intend Paragraph 5 to include liability or defense for allegations that arise as a result of the acts (including intentional misconduct), omissions, policies, procedures, or any other conduct attributable to the State, its agents, officers or employees.

> The Amended Complaint in *Gipe v. State* sets forth five different causes of action:
> I      Cruel and Unusual Punishment
> II     Intentional Infliction of Emotional Distress
> III    Negligence
> IV    Punitive Damages
> V      Wrongful Death

All parties agree that Corizon has no duty to defend with respect to Count II (taunting by prison guards as intentional infliction of emotional distress) and the portion of Count I that alleges taunting by prison guards. The State argues that other aspects of Count I and all of Counts III, IV, and V trigger Corizon's duty to defend under the contract because they necessarily involve PHS's provision of medical services.

> The Defendants in *Gipe v. State* include:

(1) State of Vermont Department of Corrections (DOC),
(2) Dr. Delores Burroughs-Biron, M.D., Director of Medical Services for DOC,
(3) John Does, unnamed Correctional Facilities Officers,
(4) Andrew Pallito, Commissioner of DOC, and
(5) David Turner, Superintendent of the prison where Ms. Ellis died (Northwest State Correctional Facility in Swanton, Vermont).

Paragraph 3 of the Amended Complaint, the introductory paragraph with respect to "Parties," states: "This Complaint seeks to establish the liability of the State of Vermont and the other defendants for their failure to properly care for Ashley Ellis and for their failure to perform their non-delegable duties while Ashley Ellis was in their custody."

There are four pages of general factual allegations (paragraphs 10-41) before the specific counts are identified. To summarize facts related to allegations of wrongdoing, those facts focus on the medical information that Dr. Burroughs-Biron was given prior to Ms. Ellis's arrival at prison and allegations of her failure to communicate that information to others, her failure to ensure availability of the needed medication, her failure to oversee procedures to ensure delivery of information and communication, and her actions in failing to address a short-staffing situation and exacerbating it by requiring a staff person to leave the facility to go to a meeting. It is alleged that the facility did not have adequate procedures for obtaining out-of-stock medications or an available CPR mouth guard.

Count I alleges that Dr. Burroughs-Biron was deliberately indifferent to Ms. Ellis's needs, and that she and Andrew Pallito and David Turner and other supervisors failed to train officers and have procedures in place in a manner that created a custom, practice, and policy of deliberate indifference to Plaintiff's constitutional right to be free from Cruel and Unusual Punishment.

In Count III (Negligence), it is alleged that the Defendants' failure to take reasonable steps to assure that Ms. Ellis received proper treatment was the proximate cause of personal injury, pain and suffering, and death.

In Count IV (Punitive Damages), it is alleged that all Defendants intentionally and knowingly acted with malice and reckless and wanton disregard of Ms. Ellis's rights, health, and safety.

In Count V (Wrongful Death), it is alleged that the Defendants' "wrongful acts, neglect and default wrongfully caused the death of Ashley Ellis" and resulting damages to next of kin.

There is no question that some acts of PHS personnel are described in the complaint, and are part of the context of the alleged wrongful acts. For example, in paragraph 27, a PHS doctor was provided with Ms. Ellis's medical records prior to her incarceration, and confirmed that she needed potassium medication. In paragraph 28, it can be inferred that PHS personnel (as well as DOC staff) did not obtain the needed medication. In paragraph 40, PHS personnel (as well as correctional officers) were unable to locate a CPR mouth guard. In the same paragraph, it can be inferred that PHS personnel were implicated in the fact that "she had been denied her medications."

Nonetheless, the acts of wrongdoing identified as the grounds for each of the causes of action are the acts of the state actor defendants, and not those of PHS personnel. There are no allegations of wrongdoing by PHS personnel that form the basis for a claim, and thus the duty to defend is not triggered. *Id.*

The State argues that Corizon has the burden to show that there is no "possible factual or legal basis on which it [the State] may be obligated to defend and indemnify the State" (page 4 of Reply Memorandum filed August 20, 2012) and cites cases for the

4

proposition that Corizon has a duty to show that the claim is excluded from coverage. This confuses principles related to insurance policy coverage with this case, which involves a negotiated contract between the State and PHS. While insurance case principles can be helpful at times in particular circumstances, they do not apply completely to noninsurance contractual indemnity relationships. *Id.* at ¶¶ 14-15.

In any event, both situations start with the same premise: it is the party seeking to invoke a duty to defend who must meet the initial burden of showing that the policy or contract triggers the obligation to defend a particular claim. That is true in the insurance context, and in this case as well, and it is the State that bears that burden in this situation since it is the State that claims that Corizon owes it a duty to defend under the Contract. In the insurance context, once a policy holder has met that burden, if there is an exclusion that the insurance company seeks to invoke, the company has the burden of proving the applicability of the exclusion. *City of Burlington v. Associated Elec. & Gas Ins. Servs.,* 170 Vt. 358, 364 (2000). There is no such exclusion situation here. This is a simple case of the State needing to show that the Contract terms obligate Corizon to provide a defense.

Analysis of the Amended Complaint shows that no negligence or wrongdoing on the part of PHS actors has been alleged; the allegations of wrongdoing are all on the part of State actors. The State has not met its burden to show that Corizon has an obligation to defend.

Because of this conclusion, it is unnecessary to consider Corizon's alternative argument based on the Covenant Not to Sue.

Based on the foregoing analysis, the Court rules that Corizon is entitled to judgment on the pleadings. Wright & Miller approves the practice of a judgment on the pleadings *sua sponte* to a non-moving party: "Rule 12(c) envisions a motion for judgment on the pleadings by one of the parties to the action. However, the Seventh Circuit has held that federal courts may grant judgment on the pleadings sua sponte if it is clear that one side is assured of victory as a matter of law and there is no material factual dispute. This approach seems both sound and efficient." 5C Fed. Prac. & Proc. Civ. § 1367 (3d ed.)

Dated at Rutland this 28th day of August, 2012.

_____
Hon. Mary Miles Teachout
Superior Judge

5